UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RAYMOND ARTHUR GENTILE,<br><br>Defendant. | No.  1:12-cr-00360-DAD-BAM<br><br>ORDER DENYING DEFENDANT RAYMOND ARTHUR GENTILE'S EMERGENCY MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)<br><br>(Doc. No. 327) |

Pending before the court is a motion for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) brought on behalf of defendant Raymond Arthur Gentile.  (Doc. No. 327.)  That motion is based in part on the purported risks allegedly posed to defendant Gentile by the ongoing coronavirus ("COVID-19") pandemic.  For the reasons explained below, defendant's motion will be denied.

**BACKGROUND**

On October 18, 2012, defendant Gentile was indicted on one count of conspiracy to manufacture, distribute, and possess with the intent to distribute 100 or more marijuana plants in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B); one count of manufacturing 100 or more marijuana plants and/or aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2;  one count of possession with the intent to distribute 100 or more marijuana plants and/or aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1),

841(b)(1)(B) and 18 U.S.C. § 2; and two counts of making false statements on Firearms Transaction Statements in violation of 18 U.S.C. § 1001.  (Doc. No. 12 at 1–4.)  On July 22, 2016, defendant was found guilty of all charges following a jury trial.  (Doc. Nos. 160, 163.)  On June 5, 2017, the court sentenced defendant Gentile to a term of imprisonment of 60 months in the custody of the U.S. Bureau of Prisons ("BOP") on each of the five counts, with those terms to be served concurrently, to be followed by an aggregate term of supervised release of 48 months— concurrent terms of supervised release of  36 months on the false statement counts and 48 months for the remaining three counts.  (Doc. No. 315 at 3–4.)  The court also imposed the mandatory $500 special assessment.  (*Id.* at 7.)

Defendant is now serving his sentence at Federal Medical Center Fort Worth ("FMC Forth Worth") in Fort Worth, Texas.  (Doc. Nos. 327 at 6; 335 at 4.)  As of the date of this order, with good time credits, defendant Gentile has now served approximately 40 months of his 60-month prison sentence and his projected release date is about 11 months from now on January 13, 2022. (*See* Doc. Nos. 335 at 4; 335-1 at 3.)

On April 22, 2020 defendant Gentile tested positive for COVID-19, and according to the government and defendant's medical records, he experienced an asymptomatic infection and was deemed recovered by May 13, 2020.  (Doc. Nos. 334 at 22; 335 at 10.)

On August 28, 2020, defendant Gentile filed a *pro se* motion seeking a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 321.)  The court referred defendant's motion to the Federal Defender's Office ("FDO") and on September 9, 2020 appointed counsel entered an appearance of defendant's behalf.  (Doc. Nos. 322–24.)  On December 7, 2020, appointed counsel filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) on behalf of defendant Gentile.  (Doc. No. 327.)  Upon the court granting leave to submit a supplemental filing, defendant's appointed counsel filed a supplemental brief in support of the pending motion on December 16, 2020.  (Doc. No. 332.)  The government filed its opposition on January 6, 2021, and on January 12, 2021, defendant filed his reply.  (Doc. Nos. 335, 336.)

/////

/////

2

1    **LEGAL STANDARD**

2        A court generally "may not modify a term of imprisonment once it has been imposed."

3    18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment

4    of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may

5    not be modified by a district court except in limited circumstances."). Those limited

6    circumstances include compassionate release in extraordinary cases. *See United States v. Holden*,

7    452 F. Supp. 3d 964, 968 (D. Or. 2020). Prior to the enactment of the First Step Act of 2018

8    ("the FSA"), motions for compassionate release could only be filed by the BOP. 18 U.S.C.

9    § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their

10   own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018).

11   In this regard, the FSA specifically provides that a court may

12           upon motion of the defendant after the defendant has fully exhausted
             all administrative rights to appeal a failure of the [BOP] to bring a
13           motion on the defendant's behalf[1] or the lapse of 30 days from the
             receipt of such a request by the warden of the defendant's facility,
14           whichever is earlier, may reduce the term of imprisonment (and may
             impose a term of probation or supervised release with or without
15           conditions that does not exceed the unserved portion of the original
             term of imprisonment), after considering the factors set forth in [18
16           U.S.C. §] 3553(a) to the extent that they are applicable, if it finds
             that –
17
             (i)     extraordinary  and  compelling  reasons  warrant  such  a
18                   reduction; or

19           (ii)    the defendant is at least 70 years of age, has served at least 30
                     years in prison, pursuant to a sentence imposed under section
20                   3559(c), for the offense or offenses for which the defendant
                     is currently imprisoned, and a determination has been made
21                   by the Director of the Bureau of Prisons that the defendant is
                     not a danger to the safety of any other person or the
22                   community, as provided under section 3142(g);

23

24   _____

     [1] If the BOP denies a defendant's request within 30 days of receipt of such a request, the
25   defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the
     date the Warden signed the response." 28 C.F.R. § 542.15(a). If the regional director denies a
26   defendant's administrative appeal, the defendant must appeal again to the BOP's "General
     Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the
27   General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is
     resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C.
28   § 3582(c)(1)(A).

                                                  3

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[2]

The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons."  U.S. Sentencing Comm'n, Guidelines Manual ("U.S.S.G.") § 1B1.13 (Nov. 2018)[3]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions).  However, a large and growing number of district courts across the country have concluded that because the Sentencing

---

[2]  Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months."  The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention.  The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP.  CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020).  However, the BOP's authority in this regard is limited to "the covered emergency period."  *Id.*  The BOP's authority expires "30 days after the date on which the national emergency declaration terminates."  *Id.* § 12003(a)(2).  After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations."  Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020).  The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release.  *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, Law360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, Law360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[3]  The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

1   Commission has not amended the Guidelines since the enactment of the FSA, courts are not

2   limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether

3   extraordinary and compelling circumstances are presented justifying a reduction of sentence

4   under 18 U.S.C. § 3582(c).  *See, e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 979 (C.D.

5   Cal. 2020) (collecting cases); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal.

6   2019).

7        In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the

8   defendant bore the initial burden of demonstrating that a sentence reduction was warranted.  *See*

9   *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998).  Although the Ninth Circuit

10  has not specifically addressed the question of which party bears the burden in the context of a

11  motion for compassionate release brought pursuant to § 3582(c) as amended by the FSA, district

12  courts to have done so agree that the burden remains with the defendant.  *See, e.g.*, *United States*

13  *v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United*

14  *States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

15                                        **ANALYSIS**

16        As district courts have summarized, in analyzing whether a defendant is entitled to

17  compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a

18  defendant has satisfied three requirements:

19            First, as a threshold matter, the statute requires defendants to exhaust
              administrative remedies.  18 U.S.C. § 3582(c)(1)(A).  Second, a
20            district court may grant compassionate release only if "extraordinary
              and compelling reasons warrant such a reduction" and "that such a
21            reduction is consistent with applicable policy statements issued by
              the Sentencing Commission."  *Id.*  Third, the district court must also
22            consider "the factors set forth in Section 3553(a) to the extent that
              they are applicable."  *Id.*
23

24  *Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, No. 16-cr-00124-

25  LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 970;

26  *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9,

27  2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be

28  "consistent with" the sentencing factors set forth in §3553(a)).

5

1   **A.      Administrative Exhaustion**

2           Defendant asserts, and the government does not dispute, that defendant has exhausted his

3   administrative remedies prior to filing his pending § 3582 motion.  (Doc. Nos. 327 at 12–13; 335

4   at 5.)  Because a failure to exhaust administrative remedies is normally viewed as an affirmative

5   defense which must be pled and proven, the court will accept the government's concession with

6   respect to administrative exhaustion and will address the merits of defendant's motion below.

7   **B.      Extraordinary and Compelling Reasons**

8           According to the Sentencing Commission's policy statement, "extraordinary and

9   compelling reasons" warranting compassionate release may exist based on a defendant's medical

10  conditions, age and other related factors, family circumstances, or "other reasons."  U.S.S.G.

11  § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other reasons" was included in the

12  policy statement at a time when only the BOP could bring a compassionate release motion, courts

13  agreed that it may be relied upon by defendants bringing their own motions for reductions in their

14  sentence under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL

15  2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

16          The medical condition of a defendant may warrant the granting of compassionate release

17  by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced

18  illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a

19  probability of death within a specific time period) is not required."  U.S.S.G. § 1B1.13, cmt.

20  n.1(A)(i).  Non-exhaustive examples of terminal illnesses that may warrant a compassionate

21  release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage

22  organ disease, and advanced dementia."  *Id.*  In addition to terminal illnesses, a defendant's

23  debilitating physical or mental condition may warrant compassionate release, including when:

24              The defendant is

25              (I)  suffering from a serious physical or medical condition,

26              (II)  suffering from a serious functional or cognitive impairment, or

27              (III) experiencing deteriorating physical or mental health because of
                the aging process,

28

6

1
2

that substantially diminishes the ability of the defendant to provide
self-care within the environment of a correctional facility and from
which he or she is not expected to recover.

3    *Id.* at cmt. n.1(A)(ii).  Where a defendant has moderate medical issues that otherwise might not be

4    sufficient to warrant compassionate release under ordinary circumstances, many courts have

5    concluded that the risks posed by COVID-19 may tip the scale in favor of release when the

6    particular circumstances of a case are considered in their totality.  *See, e.g.*, *Parker*, 461 F. Supp.

7    3d at 980 ("Since the onset of the COVID-19 pandemic, courts have determined that inmates

8    suffering from conditions such as hypertension and diabetes are now at an even greater risk of

9    deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify

10   compassionate release.") (collecting cases); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405

11   (E.D. Pa. 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr.

12   Rodriguez's health problems, proximity to his release date, and rehabilitation would not present

13   extraordinary and compelling reasons to reduce his sentence.  But taken together, they warrant

14   reducing his sentence.").

15          Compassionate release may also be warranted based on a defendant's age and other

16   related factors.  Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at

17   least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because

18   of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of

19   imprisonment, whichever is less."  U.S.S.G. § 1B1.13, cmt. n.1(B).[4]

20          Defendant Gentile argues that extraordinary and compelling reasons warranting reduction

21   of his custodial sentence exist because:  (1) his age and health conditions, according to the

22   Centers for Disease Control and Prevention ("CDC"), place him at a high risk of suffering a

23   severe illness from COVID-19; (2) he is incarcerated at FMC Fort Worth, where inmates and

24   staff have tested positive for COVID-19; and (3) he previously tested positive for COVID-19

25   while incarcerated at FMC Fort Worth.  (Doc. No. 327 at 19–20, 27–28.)  In particular, defendant

26

27   ───────────

[4]  This provision, however, does not apply here.  As noted above, defendant Gentile is only 59
28   years old, and thus his age and age-related factors do not play a role in consideration of his
pending motion.

asserts that he suffers from type 2 diabetes mellitus, hyperlipidemia, stage three kidney disease, a mass on his lungs affecting his ability to breathe, obesity with a body mass index (BMI) greater than 30, and a fatty liver.  (*Id.* at 9, 20–25; Doc. No. 332 at 2, 5.)  Moreover, defendant argues that, even though he has already contracted COVID-19, having tested positive for the virus on April 22, 2020 and experienced an asymptomatic infection, he nevertheless still faces a risk of serious illness if he were to be re-infected with COVID-19.  (Doc. No. 327 at 25–26.)

Defendant Gentile also asserts that in light of his age, medical conditions, and incarceration, he is unable to provide self-care during this pandemic because he cannot in prison take "extra precautions to maintain hygiene, a sterile environment, and physical distance from others" due to the conditions of his confinement at FMC Fort Worth.  (*Id.* at 29.)  Defendant avers that "[h]e cannot social distance" and that "he shares facilities, such as the bathroom, with multiple other individuals," and must share the "six showers, six toilets, six sinks . . . with over 200 other inmates."  (*Id.*)  Defendant Gentile argues that his lack of ability to provide self-care while incarcerated is demonstrated by his diagnoses of type 2 diabetes, hyperlipidemia, a fatty liver, and a BMI exceeding 30 while in custody.  (*Id.* at 30; Doc. No. 332 at 4–5.)  Defendant also emphasizes that COVID-19 has spread in numerous BOP facilities, including FMC Fort Worth, which has had over 600 inmates who have tested positive for COVID-19.  (Doc. No. 327 at 10–11.)  Defendant avers that the rising numbers of positive COVID-19 cases at FMC Fort Worth in recent months is "extremely concerning" for the "Federal Medical Complex[ which] hous[es] vulnerable people like [defendant] Gentile."  (*Id.* at 11.)  Accordingly, defendant's counsel argues that not only does "each one of Mr. Gentile's risk factors constitute[] an extraordinary and compelling reason for release" but also that "[e]ach of these risk factors builds on each other, creating an ever more precarious situation for [defendant] should he contract COVID-19 again."  (*Id.* at 28.)

In its opposition to the pending motion, the government contends that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison" is not an extraordinary and compelling reason supporting defendant Gentile's early release from imprisonment.  (Doc. No. 335 at 8.)  The government argues that defendant has failed to carry his

8

burden to establish his eligibility for compassionate release because "he has already recovered from illness and does not otherwise present extraordinary and compelling circumstances" to warrant his release. (*Id.* at 12.) The government does not dispute that defendant Gentile suffers from type 2 diabetes, stage three kidney disease, and a BMI over 30. (*Id.* at 9.) The government contends that the risks of severe illness from COVID-19 posed by defendant's health risks are "undermined by the fact that his age and health conditions did not result in serious complications or even worsening health" when defendant Gentile previously tested positive for COVID-19 and "remained asymptomatic." (*Id.* at 10.)

In his reply, defendant contends that his prior COVID-19 infection has no bearing on his risk of reinfection and that his health issues continue to pose a risk of severe illness if he were to contract the virus again. (Doc. No. 336 at 3–5.) Defendant also reiterates the seriousness of his health conditions, some of which were diagnosed after entering BOP custody. (*Id.* at 2–3.) Defendant Gentile asserts that because his "health has deteriorated while in BOP custody," he "has a substantially diminished ability to provide self-care" while incarcerated at FMC Fort Worth. (*Id.* at 3.)

As an initial matter, the undersigned does not discount the possibility of reinfection from the COVID-19 virus. As one district court has observed: "Without scientific conclusions as to whether reinfection is possible or how long COVID-19 immunity lasts, [courts have] err[ed] on the side of caution to avoid potentially lethal consequences." *States v. Yellin*, No. 3:15-cr-3181-BTM-1, 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020); *see also United States v. Hanson*, 470 F. Supp. 3d 1197, 1202 (D. Or. 2020) ("[T]here is no current scientific evidence to indicate that a 'recovered' COVID-19 patient is immune from reinfection, as several courts have recently acknowledged."); *but see United States v. Molley*, No. 15-cr-0254-JCC, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020) (concluding that the uncertainty surrounding the danger of re-infection with COVID-19 "cuts against compassionate release," in part because it is the defendant's burden to establish that "extraordinary and compelling" reasons for release exist). Erring on the side of caution, the court finds that defendant's fear of reinfection, and the potential consequences to him were that to occur, to be potentially well-placed. Nevertheless, as explained

9

1 | below, the court does not find that compelling or extraordinary reasons warrant a reduction in

2 | defendant's sentence at this time.

3 |      It is undisputed that according to the CDC, "[a]dults of any age" who have certain medical

4 | conditions including type 2 diabetes, chronic kidney disease, or obesity with a BMI of 30 or

5 | higher are "at increased risk of severe illness from the virus that causes COVID-19," and adults

6 | with chronic liver disease "might be at an increased risk for severe illness from the virus that

7 | causes COVID-19." *See People with Certain Medical Conditions*, Centers for Disease Control

8 | and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-

9 | medical-conditions.html (last updated December 29, 2020); (Doc. Nos. 327 at 20–22, 24; 332 at

10 | 2–5; 335 at 9–10.)  Defendant Gentile has shown that because he suffers from these medical

11 | conditions, he is at an increased risk for suffering severe illness if he were to be re-infected with

12 | COVID-19.

13 |      However, defendant Gentile has not shown, or even argued for that matter, that FMC Fort

14 | Worth is unable to properly monitor and adequately treat the medical conditions from which he

15 | suffers. *See United States v. Ayon-Nunez*, No. 1:16-cr-00130-DAD, 2020 WL 704785, at *3

16 | (E.D. Cal. Feb. 12, 2020) ("Chronic conditions that can be managed in prison are not a sufficient

17 | basis for compassionate release.") (internal quotation marks and citation omitted); *see also United*

18 | *States v. McCollough*, No. 15-cr-00336-001-PHX-DLR, 2020 WL 2812841, at *2 (D. Ariz. May

19 | 29, 2020) ("Since Defendant has contracted COVID-19, the relevant questions concern (1) the

20 | course of his illness, (2) the state of his health, (3) his prognosis, and (4) the adequacy of the care

21 | and treatment being provided to him in BOP given his pre-existing conditions. . ..  There is no

22 | evidence that the circumstances surrounding Defendant's health or treatment are extraordinary or

23 | compelling.").  Defendant's medical records reflect that he has received regular medical treatment

24 | and attention from FMC Fort Worth clinical physicians for his kidney disease, hyperlipidemia,

25 | diabetes, and other medical conditions.  (*See* Doc. Nos. 329—sealed, 334—sealed.)  Moreover,

26 | after testing positive for COVID-19 in April 2020, defendant appears to have received regular

27 | monitoring for symptoms until May 13, 2020, when he was deemed to have recovered from, what

28 | in his case was fortunately an asymptomatic infection.  (Doc. No. 329 at 2—sealed.)  The medical

1 | records filed with the court under seal also reflect that FMC Fort Worth is providing adequate

2 | medical care to defendant because he is being prescribed and provided the medications necessary

3 | to care for his health conditions.  (*See* Doc. Nos. 329—sealed, 334—sealed.)

4 |       Moreover, defendant Gentile has not persuasively argued that he is being prohibited from

5 | taking appropriate precautions to avoid contracting COVID-19 or that his ability to provide self-

6 | care at FMC Fort Worth is substantially diminished.  It has been recognized by some courts that

7 | "the presence of COVID 19 . . . necessitates a more expansive interpretation of what self-care

8 | means" and that an inability of individuals with a high risk of becoming severely ill from

9 | COVID-19 to practice appropriate hygiene, wear a mask and maintain social distancing may

10 | constitute an inability to provide self-care under some circumstances.  *United States v. Gorai*, No.

11 | 2:18-cr-00220-JCM, 2020 WL 1975372, at *3 (D. Nev. April 24, 2020)) (citation omitted).  Here,

12 | however, defendant merely emphasizes the rising numbers of positive COVID-19 cases in FMC

13 | Fort Worth, and asserts that he is unable to practice social distancing and hygiene because "he

14 | shares facilities, such as the bathroom, with multiple other individuals," including the "six

15 | showers, six toilets, six sinks that are shared with over 200 other inmates."  (Doc. No. 327 at 29.)

16 | Defendant Gentile does not provide any other specific allegations regarding his lack of access to

17 | protective gear or cleaning and sanitizing supplies, or lack of ability to social distance at FMC

18 | Fort Worth specifically.  Defendant does note that as of January 12, 2021, the date his reply brief

19 | was filed, BOP reported that 14 inmates and 34 staff members were confirmed as having active

20 | COVID-19 cases in FMC Fort Worth, and that as of December 7, 2020, the date the pending

21 | motion was filed, there were 46 inmates and 18 staff members who had tested positive for the

22 | virus.  (*Id.* at 11; Doc. No. 336 at 5.)  Defendant also emphasizes that a total of 692 inmates at

23 | FMC Fort Worth have "tested positive [for COVID-19] since the pandemic began."  (Doc. No.

24 | 336 at 5.)  But defendant has not provided any evidence regarding the conditions that he is

25 | currently facing at FMC Fort Worth, or the ways in which he is unable to provide self-care at

26 | FMC Fort Worth as a result of those conditions.

27 |       The court certainly recognizes that FMC Fort Worth initially failed to control the outbreak

28 | of COVID-19 at that institution, as evidenced by the high number of inmates that have tested

positive for the virus and the death of 12 inmates.[5]  *See United States v. Degarmo*, No. 18-cr-10128-01-JWB, 2020 WL 5253410, at *3 (D. Kan. Sept. 3, 2020) (finding that "inmates and staff at FMC Fort Worth have contracted and currently have COVID-19 in numbers higher than many other federal detention facilities").  That situation was obviously an extremely serious one and remains concerning.  However, the infection rate at FMC Fort Worth has since dropped considerably.  As the government noted at the time of filing its opposition on January 6, 2021, there were then "21 inmates and 32 staff [who] have tested positive for COVID-19" at that facility.  (Doc. No. 335 at 6.)  As of February 10, 2021, the BOP is now reporting that only 5 inmates and 34 staff members are confirmed as having active COVID-19 cases at FMC Fort Worth.  *See* https://www.bop.gov/coronavirus/ (last reviewed February 10, 2021).[6]  Even if, as defendant argues, the number of positive COVID-19 cases at FMC Fort Worth has risen in recent months, which does not today seem to be the case, that increase in infections alone is not sufficient to demonstrate that extraordinary and compelling reasons exist for his compassionate release.  *See United States v. Rios-Ayon*, No. 1:16-cr-00096-NONE, 2020 WL 7646408, at *6 (E.D. Cal. Dec. 23, 2020) (finding that even if a BOP facility "is still managing to control the outbreak at that prison to some extent, that alone does not tip the scales in favor of defendant's compassionate release in light of all the other relevant circumstances.").  Further, as noted above, it appears that the prison medical staff at FMC Fort Worth have been able to, and continue to, adequately monitor defendant's various medical conditions and care for him.  Thus, the court is not persuaded that extraordinary and compelling reasons exist warranting defendant's compassionate release based on his medical conditions and incarceration at FMC Fort Worth.  *See United States v. Dominguez*, No. 1:16-cr-35-HAB, 2020 WL 5700742, at *3 (N.D. Ind. Sept. 24,

---

[5]  FMC Fort Worth has a total population of 1,221 inmates.  FMC Fort Worth, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/ftw/ (last visited Jan. 14, 2021.)

[6]  The undersigned does not necessarily accept these reported numbers at face value given the manner in which the CDC guidelines apparently allow for individuals to be counted as recovered from the virus without confirming test results.  However, there is also no evidence before the court contradicting those reported numbers.

12

2020) (recognizing "that FMC Fort Worth has one of the highest positive test numbers in the BOP at 622" but concluding that despite those high numbers, "there is nothing that leads the Court to believe that FMC Fort Worth cannot protect Defendant from the virus or treat him should he become infected").

Accordingly, the court concludes that defendant Gentile has not met his burden of demonstrating extraordinary and compelling reasons for compassionate release under § 3582(c)(1)(A).  Therefore, his motion will be denied.

**C.      Consistency with the § 3553(a) Factors**

Finally, even if defendant Gentile's motion was supported by a showing of extraordinary and compelling reasons supporting his compassionate release, the undersigned is not persuaded that the requested reduction in his sentence would be consistent with consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a).[7]  *See Parker*, 461 F. Supp. 3d at 979.

As noted above, defendant Gentile is currently serving a 60-month sentence of imprisonment for conspiracy to manufacture, distribute, and/or possess with the intent to distribute 100 or more marijuana plants, manufacturing or aiding and abetting the manufacture of 100 or more marijuana plants, possession with the intent to distribute 100 or more marijuana plants or aiding and abetting the same, and making false statements on Firearm Transaction Statements.  (Doc. Nos. 160, 315.)  At the time of his sentencing on June 5, 2017, defendant Gentile was found to be responsible for 170 marijuana plants, 25.1 pounds of processed marijuana, 112.39 grams of kief (resin glands of marijuana plants), and an additional 1,666 grams

---

[7]  Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider:  the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

1   of marijuana.  (Doc. No. 251 at 7–8.)  Defendant was also found to have submitted false

2   statements under penalty of prosecution on two Alcohol, Tobacco, Firearms, and Explosives

3   (ATF) transfer documents in connection with his firearms purchases and attempted purchases.

4   (*Id.* at 6.)  The U.S. Probation Office determined that defendant's total offense level was 22 and

5   that his criminal history placed him in category III, resulting in an advisory sentencing guideline

6   range calling for a term of imprisonment of 60 to 63 months, with the mandatory minimum prison

7   sentence of 60 months on Counts One, Two, and Three.  (*Id.* at 16.)  The probation officer

8   recommended a low-end of the guideline range sentence of 60 months in BOP custody in light of

9   consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).  (*Id*.)  The undersigned

10   followed that recommendation and sentenced defendant to the mandatory minimum term

11   (applicable to Counts One through Three) of imprisonment of 60-month on all five counts with

12   those prison terms to run concurrently with one another, followed by an aggregate 48-month term

13   of supervised release—48 months on the marijuana-related counts and 36 months on the false

14   statement counts, to be served concurrently—and $500 in mandatory penalty assessments.  (Doc.

15   No. 315 at 3–4, 7.)

16           In his pending motion, defendant contends that, in light of the COVID-19 pandemic, "the

17   time that [defendant] Gentile has served [] in custody is sufficient to satisfy the purposes of

18   sentencing[.]"  (Doc. No. 327 at 33.)  Although defendant concedes that "the circumstances of the

19   present offense qualified [defendant] Gentile for the serious sentence this Court originally

20   imposed," he contends that his 60-month sentence is "significantly longer- almost double- that of

21   the average sentence for marijuana" and that "the government's prosecutions of marijuana cases

22   has also declined substantially" since defendant's sentencing.  (*Id.* at 33–34.)  Accordingly,

23   defendant Gentile argues that "reducing his sentence to credit for time served would still provide

24   a sufficient punishment for his actions" consistent with the § 3553(a) sentencing factors.

25           The government counters that defendant "[i]s a [c]ontinuing [d]anger" and that

26   consideration of the § 3553(a) sentencing factors "do not support his request for premature,

27   permanent release."  (Doc. No. 335 at 12, 14.)  The government argues that defendant Gentile

28   "poses a very real danger to the community" in part because the investigation into his offenses

14

1   "was initiated as a result of threats made to a victim" who "reported he was held at gunpoint by

2   the defendant and threatened." (*Id.* at 13.)  The government underscores the volume of

3   defendant's marijuana operation, noting that a search of defendant's business led to the discovery

4   of two firearms and the seizure of "170 marijuana plants, 25.1 pounds of processed marijuana,

5   112.39 grams of kief (resin glands of marijuana plants), 735 pills containing morphine, 1,831 pills

6   containing hydrocodone, 177 Seroquel pills and a small quantity of methamphetamine."[8]  (*Id.*)

7   The government emphasizes that defendant "was not operating [his business] in strict compliance

8   with California law and the jury found that he was operating in violation of federal narcotics and

9   firearms laws." (*Id.*)  The government also contends that defendant's prior criminal conviction

10   involving the cultivation of marijuana and his attempt to evade arrest in connection with this case

11   (Doc. No. 218 at 6, ¶10), in combination with the circumstances of defendant Gentile's offense,

12   "support his original sentence."  (Doc. No. 335 at 14.)

13         In his reply, defendant asserts that "the government's concern is unfounded" because "any

14   violence associated with this crime represents an anomaly" and his only prior criminal history

15   consists of "one prior misdemeanor conviction for marijuana in 1999."  (Doc. No. 336 at 5.)

16   Defendant points to his lack of disciplinary issues while in BOP custody as evidence that he had

17   "absolutely no pattern of violence, theft, or general criminal involvement throughout his life."

18   (*Id.* at 6.)  He asserts that the COVID-19 pandemic led to "life-threatening conditions of []

19   incarceration" as well as "anxiety and stress" and "long hours of isolation" that caused defendant

20   to serve "'hard' time . . . at such a facility" as FMC Fort Worth.  (*Id.*)

21         As an initial matter, and based on defendant's criminal history as described above, the

22   court finds that consideration of the risk of recidivism on the part of the defendant weighs to some

23   degree against the granting of compassionate release in this case.  *See United States v. Magana-*

24   *Lopez*, No. cr-11-04200-001-TUC-RCC (JR), 2020 WL 3574604, at *2 (D. Ariz. July 1, 2020)

25   (denying compassionate release for a non-violent offender and discounting defendant's

26

---

27   [8]  Although the government seized methamphetamine and morphine, hydrocodone and Seroquel
      pills during its search at defendant's business, the pills and methamphetamine were not included
28   in the charges filed or in the advisory sentencing guideline calculations.  (Doc. No. 251 at 8.)

1  contentions that he was at low risk of recidivism in part because he was "serving his sentence

2  after receiving prior drug trafficking").

3        Defendant asserts that his lack of disciplinary issues while in BOP custody attests to his

4  contention that he no longer poses a danger to the community.  (Doc. No. 336 at 5.)  Defendant

5  also avers that he participated in and completed several classes and programs, including a course

6  on changing criminal thinking patterns.  (Doc. No. 327 at 8.)  Some courts have granted

7  compassionate release where defendants in those cases have participated in similar programs.  *See*

8  *Parker*, 461 F. Supp. 3d at 982 (granting a defendant compassionate release in part because he

9  demonstrated rehabilitation during his imprisonment by earning two associate degrees,

10  participating in other continuing education courses and working as an education instructor,

11  "suicide companion," and career services clerk) (collecting cases).  The court acknowledges the

12  efforts on the part of defendant Gentile cited above are laudable and will assume that defendant

13  has also participated in the 500–hour BOP Substance Abuse Treatment Program recommended at

14  the time of his sentencing.  (Doc. No. 315 at 3.)  Nonetheless, even actual rehabilitation, which

15  has not necessarily been established, alone is not enough to warrant compassionate release.  *See*

16  28 U.S.C. § 994(t); U.S.S.G. § 1B1.13, cmt. n.3.

17        "The length of the sentence remaining is an additional factor to consider in any

18  compassionate release analysis,' with a longer remaining sentence weighing against granting any

19  such motion."  *United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993, at *6

20  (N.D. Cal. May 26, 2020) (quoting *United States v. Connell*, No. 18-cr-00281-RS, 2020 WL

21  2315858, at *6 (N.D. Cal. May 8, 2020)); *see also United States v. Lonich*, No. 1:14-cr-00139-SI-

22  1, 2020 WL 2614874, at *3 (N.D. Cal. May 21, 2020) (denying motions for compassionate

23  release, noting, "the Court finds it significant that defendants have served far less than half of

24  their sentences").  As of the date of this order, defendant Gentile has only approximately 11

25  months to serve on his mandatory minimum 60-month sentence.  Nonetheless, in the court's

26  view, a reduction of defendant's 60-month sentence effectively to one of 40 months would not

27  adequately reflect the seriousness of his offenses of conviction, promote respect for the law,

28  /////

1  provide just punishment, or afford adequate deterrence to criminal conduct.[9]  *See United States v.*

2  *Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477, at \*2 (D. Nev. May 28, 2020); *Shayota*,

3  2020 WL 2733993 at \*5; 18 U.S.C. § 3553(a).  The court observes that because defendant was

4  sentenced to a mandatory minimum term of imprisonment established by Congress, the granting

5  of his request for compassionate release to a sentence below that mandatory minimum term could

6  be viewed as "likely conflict[ing] with the policy goals of both Congress and the Sentencing

7  Commission."  *United States v. Brown*, Crim. Case No.: SAG-10-0344, 2020 WL 3833284, at \*5

8  (D. Md. July 8, 2020).

9          Thus, on balance, the court finds that granting defendant's motion and reducing his

10  sentence to one of time served would not be consistent with the § 3553(a) sentencing factors.

11

12  [9]  Defendant requests that the court either reduce his sentence to time served or amend the
conditions of his supervised release to require him to serve what would have been the remaining

13  portion of his custodial term on home confinement. (Doc. No. 327 at 34.)  First, the CARES Act
"'authorizes the BOP—not courts—to expand the use of home confinement' under 18 U.S.C. §

14  3624(c)(2)."  *United States v. Fantz*, No. 5:14-cr-32-BR, 2020 WL 3492028, at \*1 (E.D.N.C.
June 26, 2020) (quoting *United States v. Nash*, No. 19-cr-40022-01-DDC, 2020 WL 1974305, at

15  \*2 (D. Kan. Apr. 24, 2020) (collecting cases)); *see also United States v. Rice*, No. 12-cr-818-PJH,
2020 WL 3402274, at \*4 (N.D. Cal. June 19, 2020) (denying a defendant's request for release to

16  home confinement made in conjunction with his motion for compassionate release because "the
court has no authority to designate the place of confinement" but rather the "Bureau of Prisons

17  has the statutory authority to choose the locations where prisoners serve their sentence."); *United
States v. Gray*, No. 4:12-cr-54-FL-1, 2020 WL 1943476, at \*3 (E.D.N.C. Apr. 22, 2020) (holding

18  that the CARES Act "does not authorize the court to order defendant's placement in home
confinement").  The district court may only impose home detention as a condition of supervised

19  release, rather than as part of a sentence of imprisonment.  *See Connell*, 2020 WL 2315858, at \*5,
n.6 & \*7.  Accordingly, to do as defendant requests, the court would be required to reduce his

20  sentence to one of time served (i.e., 40 months) and modify the conditions of supervised release
to require home confinement for the remainder of his term.  The court is unwilling to do so for the

21  reasons set forth above.  The BOP knows its capabilities to effectively and appropriately care for
defendant Gentile in a custodial setting.  If the BOP determines that the defendant should be

22  released to home confinement to serve his sentence under the Attorney General's expanded
authority in that regard (*see* fn. 2, above), the court trusts it will do so.  The court notes that

23  according to the BOP, defendant Gentile is eligible to serve the remainder of his sentence on
home detention beginning July 16, 2021.  (Doc. No. 335-1 at 3.)  The court will go so far to say

24  that not only is it not opposed to defendant's designation to home confinement as soon as he is
deemed eligible by the BOP, but that the court would endorse that designation as appropriate in

25  light of the arguments advanced in the pending motion.  However, the issue the court resolves in
ruling on the pending motion is only whether in its view, under the applicable legal standards,

26  defendant's sentence should be reduced.

27

28

1

**CONCLUSION**

Because defendant Gentile has failed to demonstrate that "extraordinary and compelling" reasons exist justifying a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A) or that such a reduction at this time would be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a), his motion for compassionate release (Doc. No. 327) is denied.

IT IS SO ORDERED.

Dated:  **February 10, 2021**

_____
UNITED STATES DISTRICT JUDGE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28